**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

VERIZON WIRELESS PERSONAL
COMMUNICATIONS LP, d/b/a
VERIZON WIRELESS,

                Plaintiff,

vs.                                   Case No. 3:08-cv-1197-J-32TEM

CITY OF JACKSONVILLE, FLORIDA,

                Defendant.

_____

## <u>ORDER</u>

Plaintiff Verizon Wireless Personal Communications LP ("Verizon") has challenged the City of Jacksonville's (the "City") denial of its application to construct a wireless communications facility (more commonly known as a cell tower) as violative of the Federal Telecommunications Act of 1996 (the "Act"), 47 U.S.C. § 151 *et seq.* This case is before the Court on the parties' cross-motions for summary judgment (Docs. 16 & 17) and respective responses in opposition (Docs. 18 & 19), upon which the Court heard oral argument on September 21, 2009. (Doc. 22).

## I.    Background

Verizon is a wireless telecommunications provider seeking to expand the reach of its current wireless network. After identifying a coverage gap in a rural portion of Jacksonville, Verizon's radio frequency ("RF") engineers established a "search ring" defining the area in which a new cell tower should be located and the height at which it should be constructed to close the gap. After determining that no existing structures upon which Verizon's wireless

antenna could be located were present within the search ring,[1] Verizon selected and leased a 1.9 acre parcel of land at 6019 Betz Road (the "Proposed Site") for construction of a new tower. Verizon proposed to erect a 160-foot camouflaged "monopine"[2] tower in the center of the Proposed Site, surrounded by a landscape buffer and an eight-foot-high wooden fence.

The Proposed Site is zoned Agriculture ("AGR") with an underlying Agriculture-iii land use designation ("AGR-iii"). Contiguous properties to the Proposed Site, which are also zoned AGR, include single family homes on large parcels and undeveloped tracts of planted pines. In addition, the Proposed Site is adjacent to Pumpkin Creek Preserve State Park (the "Park")[3] and is 1,100 feet from a portion of the 46,000 acre Timucuan Ecological and Historical Preserve (the "Preserve"). According to Verizon, the Proposed Site "was chosen as the closest available site that met [both] Verizon['s] criteria" and that of Jacksonville Ordinance Code § 656.1506.[4] (Doc. 1 at ¶ 15).

_____

[1]Verizon notes that whenever possible, its wireless antennae are placed on existing structures which can satisfy the necessary height requirements set forth by its RF engineers. "This avoids the time and cost of constructing a new facility and satisfies zoning preferences." (Doc. 1 at ¶ 15). As part of the cell tower application process in Jacksonville, wireless carriers are required to show that there are no existing structures – including other towers – upon which to locate or collocate their antennae. Jacksonville Ordinance Code § 656.1508(b)(10-11).

[2]A monopine is a monopole wireless communication tower camouflaged to look like a pine tree. The antennae are external and are designed to mimic the look of branches.

[3]The Proposed Site is located approximately 150 feet to the north of a portion of the 4,000 acre Park, while the main park entrance and parking area are close to two miles away.

[4]The record is silent, however, on whether alternative sites were considered or proposed. The Jacksonville Ordinance Code does not specifically require an applicant to demonstrate

A.    *The Jacksonville Tower Ordinance*

Jacksonville Ordinance Code § 656.1501 *et seq.* (the "Tower Ordinance") sets out the applicable regulations for the location, design, and operation of cell towers within the City. A stated goal of the regulations is to "[p]rotect the natural features and aesthetic character of the City... with special attention to residential neighborhoods, public parks, transportation view corridors, historic districts, historic landmarks, and environmentally sensitive lands." Jacksonville Ordinance Code, § 656.1501(b).  To ensure that this purpose is not frustrated, the City employs a three-part application review process.

A telecommunications company wishing to construct a cell tower must submit an application to the City.[5]   Initially, a Planning Coordinator reviews the application for completeness. If complete, the application is forwarded to the Jacksonville Planning and Development Department (the "Planning Department"), which prepares a staff report recommending denial or approval. Finally, the Jacksonville Planning Commission (the "Commission") holds a public hearing and makes a final determination on the application, which it memorializes in writing.  The Commission is the ultimate decision-maker on tower applications.

Section 656.1506 of the Tower Ordinance, the provision applicable to Track II Towers

_____

that there is an actual coverage need in the area of the Proposed Site or that all other alternatives for placement have been exhausted.

[5]The Tower Ordinance classifies cell towers as either Track I, Track II or Track III based on the design and location of the proposed tower.  Each designation carries its own specific application requirements, which are set forth in Jacksonville Ordinance Code §§ 656.1505-1507, respectively.  The monopine proposed by Verizon was designated as a Track II Camouflaged/Stealth Tower, making § 656.1506 the applicable regulation in this case.

such as the monopine proposed by Verizon, reads in pertinent part:

> ...The Commission shall approve, deny, or conditionally approve the application where it finds that the proposed tower (1) complies with the tower siting and design standards and performance standards of this Subpart; **and** (2) is compatible with the existing contiguous uses or zoning and compatible with the general character and aesthetics of the surrounding neighborhood or area, **considering** (a) the design and height of the wireless communication tower; **and** (b) the potential adverse impact upon any environmentally sensitive lands, historic districts or historic landmarks, public parks or transportation view corridors.
>
> (a) Camouflaged towers. ...Track II camouflaged towers shall be permitted in all zoning districts... subject to the following siting and design requirements:
>
>> (1) Height. Track II camouflaged towers shall not be subject to a maximum height requirement, so long as the proposed tower is architecturally and aesthetically compatible with the surrounding community.
>>
>> (2) Setbacks. Regardless of the zoning district in which a camouflaged tower is proposed to be constructed, the tower shall be set back a distance of at least 100 percent of the tower height from the nearest residential lot line of any single family residence or single family residentially-zoned property, including residential PUD districts and properties with a single-family residential component in a mixed-use PUD district, or AGR IV land use category.... Camouflaged towers shall also be set back a minimum distance of 50 feet from any transportation view corridor or environmentally sensitive lands....
>>
>> (3) Collocation. Any camouflaged tower in excess of 100 feet in height shall be designed to accommodate antennas for at least two separate wireless communication service providers.

Jacksonville Ordinance Code § 656.1506 (emphasis added).

Thus, pursuant to § 656.1506, a successful Track II application requires the satisfaction of two criteria: one objective (compliance with siting, design and performance standards), and one subjective (compatibility with existing contiguous uses and the general character and aesthetics of the surrounding neighborhood or area). In making its subjective

4

determination regarding compatibility, the Commission is instructed to consider both the design and height of the proposed tower and the potential adverse impact upon any environmentally sensitive lands or parks. If both the objective and subjective elements are satisfied, the Commission is required to approve the application. If not, the Commission is vested with the authority to either conditionally approve or deny the application.

1. *Application Process and Planning Department Report*

In accordance with § 656.1506, Verizon filed an application to construct its monopine with the City on August 13, 2008. Verizon's application packet included, among other things, the following documentation: (1) a legal description of the Proposed Site; (2) a narrative description of the site plan and the relevant review standards; (3) a current zoning map of the Proposed Site; (4) a scaled site plan; (5) a map showing public parks and environmentally sensitive lands within two miles of the Proposed Site; (6) Verizon's search ring; (7) aerial photographs of the Proposed Site and surrounding area; (8) a map showing no other towers or tall structures within one mile of the Proposed Site; and (9) photo simulations showing various views of the monopine from the area surrounding the Proposed Site. The application was deemed complete and was sent to the Planning Department for review.

As part of its review, the Planning Department sent out requests for comments to various agencies and also conducted a field investigation of the Proposed Site. In early September of 2008, three letters of concern were returned to Bruce Lewis, Wireless Communications Coordinator for the Planning Department. The first was from Warren K. Anderson, President of the Public Trust Environmental Legal Institute of Florida; the second

5

from Barbara Goodman, Superintendent of the Timucuan Ecological and Historical Preserve; and the third from Craig Parenteau, an Environmental Specialist with the Florida Department of Environmental Protection. Each letter objected to the monopine on the grounds that its placement could potentially impact the viewshed of the Preserve and/or Park.[6]

To address the concerns raised by the letters, the Planning Department requested that Verizon conduct a "balloon test"[7] on the Proposed Site "to determine the extent the proposed tower [could] be seen from neighboring local, state and federal parks." (Doc. 1, Ex. C at 3). The test was conducted on October 7, 2008. Planning Department staff reported that the balloon was not visible from the main entrance or parking lot of the Park, and no one from within the Preserve contacted the Planning Department to report having

---

[6]Of specific note are the following comments: Mr. Anderson expressed his "concern[ ] that the placement of a 160 foot cell phone tower within the viewscape of the preserve will considerably interfere with the enjoyment of this pristine area, as it will exist as a blight on the surrounding environment." (Doc. 12, Composite Exhibit B-1, Letter from Warren K. Anderson dated September 9, 2008). Ms. Goodman stated that "[t]he National Park Service has made an effort to protect the viewshed of the Timucuan Preserve. We seek to provide users of the [P]reserve with an experience that has as few signs of modern man as feasible. We recommend that any cell tower be placed so that it is not visible by users of the Preserve." (Id. at Letter from Barbara Goodman, dated September 8, 2008). Mr. Parenteau noted that "the boundary of Pumpkin Hill Creek Preserve State Park is less than 200 feet southwest of the proposed tower site. We question the appropriateness of locating a tower of this height so close to a state preserve, even if the tower does happen to be 'camouflaged.'" (Id. at Letter from Craig Parenteau, dated September 15, 2008). Mr. Parenteau also highlighted a decade-long effort amongst several government entities to protect the Preserve, the Park, and the Talbot Islands, concluding that "[w]e feel that any cell tower that is approved should be sited in such a manner that it is not visible to visitors to any of those natural areas." Id.

[7]In a balloon test, a balloon the same height as the proposed tower is placed on the proposed site to demonstrate visibility from neighboring areas.

seen the balloon.[8]

Despite the balloon test results, and despite finding that the proposed monopine did meet the objective tower siting, design and performance standards of § 656.1506,[9] the Planning Department issued a staff report (the "Report") recommending denial on the grounds that the proposed tower design was not compatible with the existing contiguous uses and the general character and aesthetics of the surrounding neighborhood. In making its determination of incompatibility, the Report first considered the design and height of the monopine. The Report noted that "[a]lthough a pine tree designed tower may be the most compatible design when considering the size of the site, placement of the tower, residential uses and zoning in the area, the proposed 160 foot tower will loom over the existing pines which are approximately 60 to 80 feet in height."[10] (Doc. 1, Ex. C at 2).

_____

[8]Mr. Lewis, who was present at the balloon test, had notified four individuals working within the Preserve (Kelley Boree and Nathan Rezeau with the City of Jacksonville, Richard Bryant with the National Park Service, and Mr. Parenteau) five days prior to the test date and asked them to look out for the balloon from different areas of the Preserve. Mr. Lewis later advised Verizon that no one had contacted him about the balloon's visibility from within the Preserve.

[9] It is undisputed that the proposed tower met the Tower Ordinance's siting, design and performance standards. See Commission's Order Denying Application for Camouflaged/Low Impact-Stealth Tower (Doc. 1, Ex. E at 1) ("The proposed tower does comply with the tower siting and design standards and performance standards of Part 15, Subpart A, *Ordinance Code.*") Specifically, Verizon's monopine would provide for collocation of up to four wireless carriers and would sit more than 160 feet (100% of its height) from the nearest residential lot line and more than 50 feet away from any transportation view corridor or environmentally sensitive land. The monopine was also properly sited on AGR land and was not subject to a height restriction.

[10]It seems apparent that if height and visibility were pressing concerns, one party or the other could have proposed a shorter tower. However, the record is silent on whether Verizon could have utilized a shorter tower on the Proposed Site or whether the City might have

7

The Report next addressed the proximity of the Proposed Site to the Park and the Preserve, both environmentally sensitive lands, and found that the monopine's potential visibility from those two locations rendered it incompatible with the character and aesthetics of the surrounding neighborhood. In support of this conclusion, the Report cited the three letters sent to Mr. Lewis. The Report also stressed the Preserve's designation by the Timucuan Management Plan (the "Plan") as a Special Management Area ("SMA"), and quoted the Plan's objective for such designation as the protection of "natural views within the [P]reserve that are now unimpaired by permanent manmade elements in order to allow the public to experience the pristine, natural character of these portions of the [P]reserve." Id. Finally, the Report addressed the findings of the balloon test, stating that "[a]lthough the balloon was not visible from the parking lot in the [Park], *it is felt* the tower will be seen from other areas within the [P]ark as the [P]ark trail system is expanded." Id. at 3 (emphasis added).

2.    *The Public Hearing*

On November 13, 2008, the Commission considered Verizon's application at a public hearing. (Doc. 1, Ex. D). Mr. Lewis spoke first on behalf of the Planning Department and reiterated the Report nearly verbatim. There was no further evidence presented in opposition to Verizon's application.

Verizon (represented by its attorney, Laura Belflower) noted from the outset that the monopine met all the tower siting, design and performance standards set forth in § 656.1506,

_____

considered a shorter tower.

8

and that the Planning Department's denial was based solely on compatibility standards. To rebut this finding of incompatibility, Ms. Belflower pointed out that the Report itself indicated that a monopine was likely the most compatible design for the location. Regarding the Planning Department's concern about the height of the proposed tower, Ms. Belflower conceded that the monopine would be taller than the structures or trees in the surrounding area, but argued that this was the case with every monopine previously approved by the City and thus denial on this basis would be inconsistent with the Commission's prior approvals.

Ms. Belflower noted that despite the stated concerns about the tower's visibility from the Park and Preserve, no evidence had been presented to show that the tower would be visible by park users. She reiterated that the test balloon was not seen from the Park entrance per the Report itself and that Mr. Lewis, despite having notified lookouts in the area, had not been contacted by anyone who reported having seen the balloon. In addition, she added that "[w]hat the... Report does not indicate is that Verizon Wireless representatives offered to go to other parts of the [P]ark, offered to go to the Timucuan to see whether the balloon would be visible from those areas, and that offer was rejected as unnecessary." (Doc. 1, Ex. D at 9 ¶¶ 20-25). Ms. Belflower also took issue with the Report's contention that the monopine might be seen from other areas of the Park as the trail system was expanded, arguing that this rationale was "pure speculation and [was] not appropriate grounds to be considered by the Commission." (Id. at 10 ¶¶ 14-15).

Ms. Belflower next argued that the City could not properly rely on the Proposed Site's proximity to the Park and/or Preserve as a basis for denial when it had previously approved twelve towers in and around those environmentally sensitive lands, including one in June

2008 of similar height and distance from the Preserve.[11]  That particular tower, a 150-foot uncamouflaged unipole, was similarly sited across the street from a portion of the Park and approximately 1100 feet – roughly the same distance as Verizon's proposed monopine – from a portion of the Preserve.[12]  Ms. Belflower concluded by noting that the putative neighbors of the Proposed Site, seeking better cell service, actually supported the construction of the monopine, presenting as evidence a petition signed by sixty-seven residents of the area in favor of Verizon's application.

At the close of Verizon's presentation, Commission Chairman Register asked Ms. Belflower why a monopine design was chosen rather than a unipole.  Ms. Belflower responded that Verizon specifically chose the monopine to blend in with the surrounding area, but could have achieved its objectives with a unipole if the City so required.  After the Chairman polled the other Commissioners for further comments, Commissioner Hardesty spoke out against the placement of a tower so close to such a "very sensitive area."  (Doc. 1, Ex. D at 18, ¶¶ 24-25).  In response to Ms. Belflower's rebuttal that previous towers of similar proximity to this sensitive area had been approved as recently as five months prior, Commissioner Hardesty responded that "it seems to me that the [Planning] Department is

---

[11]Despite the June 2008 tower approval, the City notes that of the twelve towers located in and around the park, only two have been approved since November 2001.

[12]On the subject of the Preserve's designation as an SMA, Ms. Belflower asserted that Plan's objectives had not been adopted by the City and that it had not been established that the language regarding preservation of views was relevant to the part of the Preserve located near the Proposed Site.

attempting to make sure there aren't continued bad planning mistakes."[13] (Id. at 19, ¶¶ 8-10).  No further testimony or evidence was introduced; Commissioner Hardesty moved for denial of Verizon's application and the Commission unanimously agreed.

That same day, the Commission issued an order denying Verizon's application (the "Order").[14]  (Doc. 1, Ex. E).  The Report was attached as Exhibit A to the Order.  The Order recounted no additional evidence other than that set forth in the Report, and stated simply that the Commission "adopts and incorporates herein the findings and recommendations of the Report."  Id. at 1.  The official basis for denial, as stated in paragraph 4 of the Order, was: "The proposed tower design is not compatible with the existing contiguous uses, or zoning and is [sic] compatible with the general character and aesthetics of the surrounding neighborhood, or area."  Id.

Verizon filed suit under the Act, alleging that the Commission's decision was not supported by substantial evidence contained in a written record as required by 47 U.S.C. § 332(c)(7)(B)(iii).  In its complaint, Verizon seeks both a declaratory judgment and a permanent mandatory injunction ordering the City to approve its application.  As the record before this Court is fixed and the facts are not in significant dispute, the parties have agreed that this case is appropriate for adjudication on cross-motions for summary judgment.

---

[13]Commissioner Hardesty also noted that he was aware of a monopine in Jacksonville's Arlington area that is "certainly a pine-tree-looking thing, but it is way above the other pine trees, I mean, ridiculously so.  It's the pine tree on steroids, and it just sticks out like a sore cell phone tower."  (Doc. 1, Ex. D at 20, ¶¶ 9-13).

[14]The Commission's Order denying Verizon's application constitutes a final action of the City.  Jacksonville Ordinance Code, § 656.1506(d)(6); see Preferred Sites, LLC v. Troup County, 296 F.3d 1210, 1217 (11th Cir. 2002).

## II. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

"In determining whether to grant summary judgment, the Court must view the evidence and inferences drawn from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor." T-Mobile South LLC v. City of Jacksonville , Florida, 564 F.Supp. 2d 1337, 1340 (M.D. Fla. 2008) (citing Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir.1988); WSB-TV v. Lee, 842 F.2d 1266, 1270 (11th Cir.1988)).

"The principles governing summary judgment do not change when the parties file cross-motions for summary judgment. When faced with cross-motions, the Court must determine whether either of the parties deserves judgment as a matter of law on the undisputed facts." Id.

## III. Discussion

### A. *The Federal Telecommunications Act of 1996*

Congress enacted the Act to "promote competition and higher quality in American telecommunications services and 'to encourage the rapid deployment of new telecommunications technologies.'" Michael Linet, Inc. v. Village of Wellington, Fla., 408 F.3d 757, 761 (11th Cir. 2005) (quoting City of Rancho Palos Verdes, Cal. v. Abrams, 544 U.S. 113, 115 (2005)). "With respect to the construction of telecommunications facilities,

12

Congress recognized zoning decisions by state and local governments had created an inconsistent array of requirements, which inhibited both the deployment of personal communications services and the rebuilding of a digital technology-based cellular telecommunications network." Preferred Sites, 296 F.3d at 1214. Despite this, "Congress also acknowledged 'there are legitimate State and local concerns involved in regulating the siting of such facilities..., such as aesthetic values....'" Id. (quoting H.R.Rep. No. 104-204, at 94-95 (1995), reprinted in 1996 U.S.C.C.A.N. 10, 61).

Congress sought to address these concerns by preserving the authority of local and state governments to regulate zoning and land use while also instituting "a number of substantive and procedural limitations upon the authority of state or local governments to regulate the construction of facilities for wireless communication services." Id. at 1214-15. The Act was therefore designed to "strike a balance between 'two competing aims – to facilitate nationally the growth of wireless telephone service and to maintain substantial local control over siting of towers.'" Omnipoint Commc'ns, Inc. v. City of White Plains, 430 F.3d 529, 531 (2d Cir. 2005)(quoting Town of Amherst, N.H. v. Omnipoint Commc'ns, 173 F.3d 9, 13 (1st Cir. 1999). Thus, while local authorities retain the authority to regulate the placement and construction of towers, "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing[15] *and supported by substantial evidence contained in a*

---

[15]This Court has found that the ruling body's incorporation of another department's written recommendations is sufficient to support the Act's "in writing" requirements. See T-Mobile, 564 F.Supp. 2d at 1344-45.

13

*written record.*" 47 U.S.C. § 332(c)(7)(B)(iii) (emphasis added). The party seeking to overturn the governing body's decision bears the burden of proving that the decision is not supported by substantial evidence. American Tower LP v. City of Huntsville, 295 F.3d 1203, 1207 (11th Cir. 2002)

"[T]he 'substantial evidence' standard is the traditional substantial evidence standard used by courts to review agency decisions." Linet, 408 F.3d at 762. This standard has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. (internal citation and quotation omitted). As such, substantial evidence requires "more than a mere scintilla but less than a preponderance." Id. (internal citation and quotation omitted). In utilizing this standard, however, a court may not substitute its own judgment for that of the local governing body. Preferred Sites, 296 F.3d at 1218. Nevertheless, the court must find that the standard has not been met if it "cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the [governing body]'s view." OPM-USA-Inc. v. Board of County Com'rs of Brevard County, 7 F.Supp. 2d 1316, 1323 (M.D. Fla. 1997)(internal citations and quotations omitted).

B. *Propriety of Denial on the Basis of Aesthetic Concerns in the Eleventh Circuit*

As it is undisputed that Verizon's application complied with the objective standards of § 656.1506, this Court's inquiry is limited to whether there was substantial evidence to support the Commission's conclusion that the proposed monopine is not compatible with existing contiguous uses and zoning and with the general character and aesthetics of the surrounding neighborhood or area. The relevant "record" within the meaning of §

14

332(c)(7)(B)(iii) is the "written record of all the evidence before the governing body at the time the decision was made." Vertex Development, LLC v. Marion County, Fla., 2008 WL 2994259 at *13 (M.D. Fla. Aug. 1, 2008) (citations omitted). The City contends that the Report, the photo-simulations of the proposed monopine, and the three letters expressing concern about its potential impact on the viewshed of the Park and Preserve constitute substantial evidence supporting the Commission's decision. Verizon disagrees, arguing that the Commission's denial was based solely upon "generalized statements about potential adverse aesthetic impact." (Doc. 16 at 16).

The Eleventh Circuit has determined that "[a]esthetic concerns may be a valid basis for denial of a permit *if* substantial evidence of the visual impact of the tower is before the [governing body]." Preferred Sites, 296 F.3d at 1219 (emphasis in original). In Preferred Sites, the Court found that Troup County's denial of a conditional use permit for a 250-foot tower was not supported by substantial evidence. Id. The only evidence presented in opposition to the proposed tower was five petitions signed by 58 local residents, only two of which were complete. Id. The minutes of the public hearing did not indicate that any opposition was raised at that forum. Id. Based on this "scant evidence of opposition," the Court concluded that "the citizens' generalized concerns about aesthetics [we]re insufficient to constitute substantial evidence upon which" a decision-making body could rely. Id.

However, in American Tower the Eleventh Circuit reached a different result. American Tower, 295 F.3d at 1206. In that case, the proposed tower site was zoned residential and was located in an established residential neighborhood near or adjacent to

15

two schools and several soccer fields.[16] Id. At a public hearing on the application, several local residents spoke in opposition to the proposed tower and over 60 more signed a position disapproving it. Id. The testimony included general evidence presented by a local realtor with 16 years' experience that locating cell phone towers in residential neighborhoods devalues surrounding properties and makes them more difficult to sell. Id. at 1208. More specifically, the realtor stated that she had "already lost potential buyers for her own property in the area because of the proposed tower." Id. (footnote omitted). Residents also testified about potential safety issues regarding the proposed tower's proximity to facilities used by children. Id. at 1209. Despite American Tower's presentation of rebuttal evidence, the Court found that it could not "displace the Board's fair estimate of conflicting evidence." Id. at 1209 n.8.

The Eleventh Circuit most recently addressed the issue of aesthetic objections to cell phone towers in Linet. Linet, 408 F.3d at 761. In reviewing Preferred Sites and American Tower, the Court stated that "[a] blanket aesthetic objection does not constitute substantial evidence under § 332. Such a standard would eviscerate the substantial evidence requirement and unnecessarily retard mobile phone service development. Aesthetic objections coupled with evidence of an adverse impact on property values or safety concerns can constitute substantial evidence."[17] Id. (internal citations omitted). The Court added that

---

[16]Because the proposed site was zoned residential and the proposed tower height would exceed Huntsville's 100 foot height limit, American Tower was required to obtain a special exception and a variance to construct its tower. Id.

[17]In Linet, the Court found that testimony from residents, including a local realtor, concerning the proposed site's negative impact on real estate values and its unnecessary

"[a]lso relevant is whether the company can reasonably place a cell site in an alternative location and eliminate the residents' concerns." Id. at 762 (citing PrimeCo Pers. Commc'ns, Ltd. P'ship. v. City of Mequon, 352 F.3d 1147, 1151 (7th Cir. 2003)).

C.    *T-Mobile and Vertex*

In support of their respective positions, the parties also rely on two decisions of this Court entered only two months apart, both of which draw from the Eleventh Circuit precedent set forth above.

The City argues that this case is identical to T-Mobile, in which Judge Moore upheld the Commission's denial of two cell tower applications based on similar evidence as present in this case.[18]  See T-Mobile, 564 F.Supp. 2d at 1346.  In T-Mobile, the wireless carrier sought approval for construction of a 150-foot tower[19] in an area on Jacksonville's southside zoned rural residential ("RR").  Id. at 1339.  The Planning Department recommended denial, finding that "'[t]he proposed design and height of the tower are not compatible with existing use and zoning' because 'RR zoning districts have maximum height limitations of 35 feet and

_____

proximity to a middle school constituted sufficient evidence to support denial.  Id. at 762.

[18]In T-Mobile, the City "relied upon a report issued by the Planning Department (after visiting the Proposed Site and considering the uses of the adjacent properties) and testimony and exhibits provided by T-Mobile, including contextual photographs/photographic simulations of the Proposed Site."  T-Mobile, 564 F.Supp. 2d at 1346.  However, unlike this case, the City also heard fact-based opposition testimony from witnesses at the public hearing.  Id. at 1344; see infra.

[19]In its second application, T-Mobile lowered the tower height to 130 feet.  Both applications were denied by the Commission.  Id. at 1339.

the proposed tower is 150 feet in height.'"[20]  Id. at 1342.  At the hearing, the Commission heard testimony from two witnesses (both local residents) that the tree cover on the Proposed Site was due to be cleared to make way for new residential subdivisions, which would counteract T-Mobile's attempts to camouflage the tower.[21]  Id. at 1344.  T-Mobile attempted to characterize the City's evidence as subjective aesthetic concerns "so generalized as to lack any probative value," but this Court disagreed.[22]  Id. at 1346.  This Court found that "under the Act the Commission is entitled to made an aesthetic judgment *as long as the judgment is grounded in the specifics of the case*, and does not evince merely an aesthetic opposition to cell-phone towers in general."  Id. (emphasis added; internal quotation and citations omitted).

Verizon, on the other hand, argues that this case is identical to Vertex, in which Judge Hodges found that Marion County's denial of a special use permit to construct a cell tower due to incompatibility with the surrounding land uses was not supported by substantial evidence.  See Vertex, 2008 WL 2994259 at *1.  In Vertex, the record established that the

_____

[20]Unlike this case, in T-Mobile, the Commission stated that denial was based on *both* the objective and subjective factors of § 656.1506. Id. at 1346.

[21]The testimony further indicated that three new residential housing developments were planned in the immediate vicinity of the proposed site; these facts were uncontroverted.  Id. at 1348.

[22]The record reflected ample objective facts to support the Commission's finding that the proposed tower would be incompatible with its contiguous uses: the immediate area was being developed, the tree cover surrounding the proposed site was being removed, and the height limits of all surrounding structures – based on the contiguous RR zoning – would be capped at 35 feet.  T-Mobile, 564 F.Supp. 2d at 1348-49.

proposed tower met all objective setback and siting requirements;[23] the only evidence in opposition to the application was the testimony of several residents at the public hearing. Id. at *15-*16. As the residents offered only opinions rather than facts or evidence to support their concerns about the tower's aesthetic impact, this Court found that their "testimony was nothing more than purely subjective concerns as opposed to articulated, fact based reasons keyed to any of the objective requirements (or limitations) of the [Marion] County Code. Each of the witnesses who opposed the proposed tower merely raised concerns that the tower would be an eyesore, and would ruin the beauty of the surrounding areas." Id. at *15.[24] Judge Hodges thus distinguished other decisions – including T-Mobile – which upheld denials of special use permits for subjective aesthetic reasons because "in each of those cases, the [opposing residents'] testimony *was supported by verifiable and specific facts as well as other evidence*." Id. at *15, n.40 (emphasis added).

    D.    *Southeast Towers v. Pickens County, Ga.*

Preferred Sites, American Tower, Linet, T-Mobile and Vertex are not at all irreconcilable; on the contrary, they demonstrate that cases under the Act are each decided on their own unique facts and the different local ordinances at issue. Moreover, they all reach this same conclusion: aesthetic concerns *can* be a valid basis for denial of a permit

---

[23]On this subject, Judge Hodges went as far as to say that proximity concerns alone could not constitute substantial evidence because they were "specifically addressed by the Code's established setback requirements", which Vertex had not only met but exceeded. Id. at *16.

[24]The only witness who gave any fact-based testimony was a woman speaking on behalf of the application "who testified that she watched Vertex conduct its photo simulation testing and that only a very small portion of the tower would be visible from her home." Id. at 15, n.38.

by a local governing body, *so long as* a judgment based on those concerns is supported by objective facts or evidence.[25]  The question here is whether the requisite factual groundwork was before the Commission to constitute substantial evidence supporting the Commission's denial on aesthetic grounds.

This case is somewhat different from the others cited in that the alleged aesthetic impact of Verizon's monopine does not manifest itself in the typical way.  The Proposed Site is not located near an established residential community; there is no contention that the monopine will cause depressed property values or safety issues.  Nor is the Proposed Site located in an area being considered for future development.  Instead, the aesthetic concern at issue is the monopine's visual obtrusiveness allegedly hindering public enjoyment of nearby pristine property which has been identified as worthy of protection and preservation.

The most factually instructive case for this scenario – one which also applies the Eleventh Circuit precedent set forth above – is Southeast Towers, LLC v. Pickens County, Ga., 625 F.Supp. 2d 1293 (N.D. Ga. 2008).  In Southeast Towers, the proposed site of a 250-foot tower was located near Tate, Georgia, a village known for both its scenic beauty and a number of structures listed in the National Register of Historic Places.[26]  Id. at 1295.

_____

[25]It may seem anomalous to require "objective" evidence of aesthetic concerns, particularly if one ascribes to the view that "beauty is in the eye of the beholder."  However, what the courts are saying is that there must be some actual evidence of adverse visual impact before a local government can deny a cell tower application solely on aesthetic grounds.

[26]The proposed site was approximately 1100 feet – the same distance as Verizon's monopine would be from the Preserve – from several sites in the Tate Historic District that are listed on the National Register.  Id.

A representative of the Marble Valley Historical Society, Inc. ("Marble Valley") wrote a letter in opposition to the placement of the tower contending that it would "create a detrimental view of the [Tate] historic district and impact the long range plans to preserve the original character of the Georgia Marble Company village with many homes over 75 years old." Id. at 1297 (internal quotation and citation omitted). When Southeast Towers' application was presented at a meeting of the Pickens County Planning Commission, "[t]wo representatives of Marble Valley... attended the meeting and voiced their concerns about the visual impact of the tower on the Tate Historic District, urging the commission to require further testing." Id. The Planning Commission acquiesced, voting to require a balloon test "to consider the visual impact of the tower on the Historic District." Id.

Following the balloon test, the Planning Commission held a public hearing at which Southeast Towers' representatives presented evidence that the test demonstrated no aesthetic impact upon the Historic District. Id. A number of community members (including a Marble Valley representative) rebutted this contention, stating that at least six homes in the Historic District would suffer a "direct and adverse visual impact" from the proposed placement of the tower. Id. This testimony was "supplemented... with photographs taken on the day the balloon test was conducted from the locations of the six historic structures. Each photograph *demonstrated* that the balloon (and thus the proposed cell tower) would be directly visible from structures within the Tate Historic District." Id. (emphasis added).

After considering the application and the testimony, the Planning Commission submitted a report to the Commissioner, who denied Southeast Towers' permit in a four-page letter "stating that he *resolved the conflict* concerning whether the proposed cell phone

21

tower would have a material visual impact on the Historic District in favor of the individuals and organizations opposing the permit." Id. at 1298 (emphasis added). The Commissioner also stated that the pictures showing the balloon's visibility from the six historic sites served to "*establish the opinion*" of the Marble Valley representative "that the visual impact of a cell tower on this proposed site would be of a significant magnitude which would materially diminish the visual integrity of the Historic District." Id. (emphasis added).

The court, after reviewing Linet, American Tower, and Preferred Sites, found that "[b]ased on the evidence in the record of the *specific effect* the placement of the cell tower would have on the Tate Historic District... the Commissioner's determination that the proposed tower would adversely impact the aesthetic harmony of the Tate Historic District was 'grounded in the specifics of the case.'" Id. at 1304 (citing Southwestern Bell Mobile Systems, Inc. v. Todd, 244 F.3d 51, 61 (1st Cir. 2001))(emphasis added); see also T-Mobile, 564 F.Supp. 2d at 1346. The court concluded that the Commissioner's "decision was not based merely upon general objections to the aesthetic appeal of a telecommunications tower; rather, photographs and specific supporting testimony *demonstrated* that the proposed tower would have *a specific and material impact*.... Based on this evidence, the Commissioner's decision did not violate the substantial evidence requirement of § 332(c)(7)(B)(iii)." Southeast Towers, 625 F.Supp. 2d at 1304 (emphasis added).

E.    *The Court's Decision*

The crux of the issue is that Verizon seeks to place its monopine near two

environmentally sensitive areas[27] which the City and other government agencies are going to great lengths to protect. The Court does not discount the importance of protecting the pristine nature of the Park and Preserve. However, before the City can deny – based on aesthetics – an application that undisputedly meets all siting, zoning, and design criteria, it must have evidence that those areas would *actually* be impacted, rather than relying on speculative concerns about the proposed tower's potential visibility.

On the record before the Commission, and therefore the record before this Court, there appears to be no fact-based evidence supporting the concerns of the Commission, the Planning Department, or the three letter-writers that the monopine could be seen at all from either the Park or the Preserve. For example, while Mr. Anderson expresses concern that the monopine "will exist as a blight on the surrounding environment" because it will be placed "within the viewscape of the [P]reserve," (Doc. 12, Composite Exhibit B-1, Letter from Warren K. Anderson dated September 9, 2008), there is nothing in the record supporting his conclusion that the proposed tower will *actually* be within the viewscape of the Preserve. Indeed, the balloon test requested by the City failed to provide evidence of any visual impact on the Park or Preserve. The other two letters are even more speculative. Ms. Goodman "recommend[s] that any cell tower be placed so that it is not visible by users of the Preserve" without stating so much as a belief that Verizon's proposed tower would actually be visible.

---

[27]The City also claims that the few residences on the rural parcels surrounding the Proposed Site make the monopine incompatible with contiguous uses. There is no evidence in the record that this is the case; in fact, the only evidence regarding compatibility with residential uses (the petition from the monopine's putative neighbors supporting the proposed tower) is to the contrary.

(Id. at Letter from Barbara Goodman, dated September 8, 2008). Mr. Parenteau "question[s] the appropriateness of locating a tower of this height so close to a state preserve" and expresses his opinion that "any cell tower that is approved should be sited in such a manner that it is not visible to visitors to any of those natural areas." (Id. at Letter from Craig Parenteau, dated September 15, 2008). However, there are no facts in Mr. Parenteau's letter which would elevate his concerns from speculative to specific, and he (like the other letter-writers) provides no documentary or photographic evidence in support.

In contrast, Marble City's letter of opposition in Southeast Towers raised concerns about a potential visual impact upon the Tate Historic District, then utilized the balloon test to establish that impact. See Southeast Towers, 625 F.Supp. 2d at 1297. Without the results of the balloon test as validation, Marble City's concerns were merely conclusory and did not *demonstrate* the visual impact of the tower. See id. at 1304. Absent a similar demonstration in this case, the opinions of the letter-writers cannot support a finding that Verizon's monopine will have an adverse aesthetic impact on the surrounding area.

Similarly, the Report's reference to the potential future expansion of the Park's trail system is relevant only if the record demonstrates the aesthetic impact of the monopine upon the location(s) of those future trails. While true that the Proposed Site is adjacent to one corner of the Park – and thus common sense would indicate that the monopine would be visible from that location – nowhere in the record is there evidence that anyone (*e.g.*, a staff member of the Planning Department or one of the three letter-writers) viewed the balloon test from that area and was struck by the impact, or, for that matter, that any future trail is planned for or likely to be placed there. Without such evidence, the City is essentially

arguing that the application should be denied based solely upon the proximity of the Proposed Site to the Park. However, proximity concerns are addressed specifically by the objective portion of § 656.1506, which Verizon exceeded by siting its monopine 150 feet (three times the 50 foot setback requirement) from the Park. It would therefore be improper to allow the City to find a tower incompatible based on proximity *alone* where the setback requirements have been met and there is no evidence to support the subjective determination that proximity would cause an adverse impact on the adjacent properties. Setting such a precedent would eviscerate the objective requirements of § 656.1506 and give the City license to deny any application for aesthetic purposes based solely on proximity.[28]

The City also cannot properly contend that the photosimulations prepared by Verizon constitute substantial evidence supporting denial of the application. While true that the photos were before the Commission for review, they were never mentioned in the Report, at the hearing, or in the Order as a basis for finding the monopine incompatible with existing contiguous uses. It is therefore impossible for the Court to discern whether these photos were actually relied upon at the time the Commission made its decision or are merely cited now as *post hoc* evidence of incompatibility. Even if weight were given to the fact that the

---

[28]A more certain way to regulate proximity – and thus to protect the viewshed of environmentally sensitive lands – would be to extend the setback requirement. For example, if § 656.1506 required a setback of 200 percent of the proposed tower height from environmentally sensitive lands (which, the Court notes, two out of the three letter-writers mistakenly believed was the standard), the City would have had an objective basis for denial under the Tower Ordinance and would not need to rely on compatibility considerations alone. Of course, this is not a decision for the Court to make.

monopine appears in the photosimulations to "loom" over the area from certain vantage points outside the Park and Preserve (but not from others), the results of the balloon test demonstrated no actual visual impact inside the Park and Preserve. This is different from Southeast Towers, where the Commissioner expressly resolved a factual conflict concerning whether the proposed tower would be visible from the Tate Historic District in favor of the residents based on objective evidence of its visibility. Southeast Towers, 625 F.Supp. 2d at 1298. No such objective evidence exists in this case, and the Planning Department's "fe[eling] the tower will be seen from other areas within the [P]ark" cannot, without more, be considered substantial evidence. (Doc. 1, Ex. C at 3).[29]

Finally, the City contends that T-Mobile stands for the proposition that all denials based upon visual impact must be assessed "on a case-by-case basis" (Doc. 19 at 12) for "the particular location at issue." T-Mobile, 564 F.Supp. 2d at 1346 (internal citation and quotation omitted). This is self-evident, and the Court agrees entirely that Verizon cannot prevail based solely upon the City's prior approval of other towers in and around the Park and Preserve.[30] To suggest otherwise would mean that the Commission could never, in the words of Commissioner Hardesty, prevent "continued bad planning mistakes." (Doc. 1, Ex.

---

[29]Nothing in the Tower Ordinance appears to preclude the Commission from requesting additional evidence regarding a cell tower application before making a final decision on whether the proposed tower meets the requisite compatibility standards. One option apparently available to the Commission is to send the matter back to the Planning Department for further development of the factual record. In this case, for example, the Commission might have requested that the Planning Department provide evidence to support its "feeling" that the monopine could be seen from certain areas of the Park.

[30]It does, however, demonstrate that the City is not necessarily hostile to *any* towers in the area. See id. at 1350.

D at 19, ¶¶ 8-10). However, the fact that aesthetic impact is addressed on a location-by-location and case-by-case basis also means that the City cannot rely *solely* on the Proposed Site being adjacent to sensitive lands as a basis for denial. It must base its decision upon substantial evidence, for the particular location in question, that the aesthetic impact makes the proposed cell tower incompatible with contiguous uses and the surrounding area. No such evidence exists in this case. When viewing the complete record, including the body of evidence opposed to the Commission's decision, the Court cannot conscientiously find substantial evidence supporting that decision. OPM-USA-Inc., 7 F.Supp. 2d at 1323.

## IV. Conclusion

In Vertex, Judge Hodges noted that:

It seems that [cell phone] towers, like prisons, are just not welcome additions to the landscape, and those who hold those sincere opinions are entitled to some sympathy. This makes for hard cases when they are presented to local political bodies who might find it difficult to explain to their constituents, in an emotionally charged public hearing, the arcane difference between personal preference and substantial evidence. But the law requires the latter – substantial evidence – and while the substantial evidence standard is a lenient one (being somewhat less than as a preponderance of the evidence), when a tower erector meets all of the objective and reasonably relevant prerequisites established in advance by local authority for the placement of communications towers, the purely subjective preferences of the towers' putative neighbors,[31] not augmented by any technical or objective facts or evidence, simply do not constitute 'substantial evidence' upon which local government can properly rely in denying an application.

Vertex, 2009 WL 2994259 at *1 (internal footnote omitted).

The Court is sympathetic to the City's commendable objective of preserving the

---

[31]In this case, the putative neighbors who usually oppose such towers – local residents – are actually in support of Verizon's application. See pg. 10, *supra*.

viewscape of both the Park and Preserve.[32]  Morever, this Court is always reluctant to interfere in the workings of local government.  However, before the City can deny a cell tower application based solely on aesthetic concerns such as visual impact, the Act requires that it muster some (even if not much) real evidence of that impact.  "Mere generalized concerns regarding aesthetics... are insufficient to create substantial evidence justifying the denial of a permit" under the Act.  Preferred Sites, 296 F.3d at 1210.  As the record before the Commission contains no support for the opinions underlying its denial, Verizon has demonstrated that the City's decision was not supported by substantial evidence.  See American Tower, 295 F.3d at 1207.[33]

As its remedy, Verizon seeks a mandatory permanent injunction ordering the City to approve its application as-is.  Although the Act does not expressly provide a remedy for violations of its siting provisions, the Eleventh Circuit has stated that mandatory injunctive relief can be appropriate in such circumstances.  Preferred Sites, 296 F.3d at 1222 ("We conclude an injunction ordering issuance of a permit is an appropriate remedy for a violation of § [332]").  However, as "[t]he grant of equitable relief is a matter of judicial discretion," Id. at 1220; see also Castle v. Sangamo Weston, Inc., 837 F.2d 1550, 1563 (11th Cir.

---

[32]See Jacksonville Ordinance Code § 656.501(b); supra pg. 3.

[33]The Court emphasizes that this holding is strictly limited to the facts of this case.  The jurisprudence interpreting the Act demonstrates that the "substantial evidence" review is a highly fact-intensive one, especially where the local government's denial is based on aesthetics.  See T-Mobile, 564 F.Supp. 2d at 1346.  This Court presently has on its docket several cases brought under the Act, each challenging denials of cell tower permits.  As the outcome of those cases will depend so heavily on their facts, the Court cautions parties against relying too heavily on this holding for precedential value.

28

1998)(explaining grant or denial of equitable relief lies in the discretion of the district court), and mandatory injunctive relief is "an extreme form of equitable relief," <u>Preferred Sites</u>, 296 F.3d at 1220, the Court does not view itself as being required *ipso facto* to order the City to approve Verizon's permit exactly as it was submitted.

Where a mandatory injunction is sought, "courts apply a heightened standard of review; plaintiff must make a clear showing of entitlement to the relief sought or demonstrate that extreme or serious damage would result absent the relief." <u>New York SMSA Ltd. Partnership v. Town of Clarkstown</u>, 99 F.Supp. 2d 381, 389 (S.D.N.Y. 2000). In this case, the record is silent on whether "the company can reasonably place a cell site in an alternative location." <u>See</u> <u>Linet</u>, 408 F.3d at 762; <u>see</u> *supra* n.4. Nor is there evidence as to whether Verizon could have utilized a shorter tower on the Proposed Site or whether the City might have considered a shorter tower. <u>See</u> *supra* n.10. There may be other reasonable alternatives. Before finally determining a remedy, the Court directs the parties to confer to see if an agreement can be reached.[34] If, after good faith efforts, the parties are unable to reach an understanding, Verizon may file a motion requesting a specific remedy and demonstrating the legal and factual basis for it. Accordingly, it is hereby

**ORDERED**:

1. Defendant City of Jacksonville's Motion for Summary Judgment (Doc. 17) is **DENIED**.

2. Plaintiff Verizon Wireless Personal Communications LP's Motion for Summary

---

[34]If the parties desire the Court to appoint a mediator or a Magistrate Judge to facilitate these discussions, they may so request.

Judgment (Doc. 16) is **GRANTED** to the extent that the City's denial of Application CTW-08-18 is declared a violation of 47 U.S.C. § 332(c). The Jacksonville Planning Commission's Order Denying Application CTW-08-18, dated November 13, 2008, is declared null and void. The Court reserves ruling on Verizon's request for a mandatory injunction pending further efforts between the parties to resolve this issue.

3. No later than **January 15, 2010**, the parties should report to the Court concerning the status of their discussions. If discussions between the parties fail, Verizon may file a remedy motion any time on or after **January 15, 2010.** The City should respond to any motion filed no later than **January 29, 2010**.

4. The Clerk shall administratively close the case pending receipt of the parties' joint report.

**DONE AND ORDERED** at Jacksonville, Florida this 17th day of November, 2009.

TIMOTHY J. CORRIGAN
United States District Judge

jmm.
Copies:

counsel of record